[TAGGED OPINION]



**ORDERED in the Southern District of Florida on June 22, 2012.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:                                    Case No. 10-17707-EPK

**ROBERT MILTON INMAN,**                  Chapter 11

      Debtor.
_____/

**ROBERT MILTON INMAN,**

      Plaintiff,

v.                                        Adv. No. 11-01033-EPK

**CAROL A. HEARN,**

      Defendant.
_____/

## AMENDED[1] MEMORANDUM OPINION

---

[1] This Amended Memorandum Opinion is entered solely to correct the second sentence of the Findings of Fact section of this Court's *Memorandum Opinion* [ECF No. 52], which stated that the parties' marriage was dissolved on December 30, 2012, when in fact the parties' marriage was dissolved on December 30, 2008.

THIS MATTER came before the Court for trial on February 27, 2012 upon the *Adversary Complaint* [ECF No. 1] (the "Complaint") filed by Robert Milton Inman (the "Plaintiff") against Carol A. Hearn (the "Defendant").  This Memorandum Opinion presents the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

The Complaint contains seven counts.[2]  Count I seeks an order, pursuant to section[3] 506(d), avoiding three liens obtained by the Defendant, in whole or in the alternative to the extent under-secured, on the ground that the liens are based on a Florida state court judgment later determined not to be a final judgment for purposes of appeal.   Count II seeks an order, pursuant to section 506(d), avoiding the same three liens, in whole or in the alternative to the extent under-secured, on the ground that they exceed the security interests granted to the Defendant in a Florida state court judgment and a related mediation agreement entered into in connection with the parties' divorce.  Count III seeks an order pursuant to section 542(a) directing turnover of property of the estate held by the Defendant or payment of the value thereof and also an accounting.  Count IV seeks an award of unspecified damages.  Count V seeks a determination that the debt set forth in the Defendant's proof of claim is not excepted from discharge under either section 523(a)(5) or section 523(a)(15).  Count VI seeks equitable subordination, pursuant to section 510(c), of the Defendant's claim and transfer to the estate of the liens obtained by the Defendant. Count VII seeks disallowance of the Defendant's claim or, in the alternative, a determination that any amount awarded to the Plaintiff be set off against the Defendant's claim.  The Defendant agreed to turn over the property sought in Count III within thirty

---

[2] The Complaint was ill presented.  This was compounded by the Plaintiff's disorganized presentation at trial.  The lack of coherent exposition at trial lead the Court to request post-trial briefs.  The Plaintiff's post-trial briefs were confusing and misleading.  As a result, it has taken the Court more than two months to wade through the evidence, attempt to make sense of it in light of the pleadings, and render this decision.

[3] Unless otherwise indicated, the terms "section" and "sections" used in this Order refer to sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*.

days after entry of judgment.  At trial, the Plaintiff informed the Court that he would not seek relief under Count IV for damages.

The Court considered the testimony of witnesses and the documentary evidence admitted at trial in this adversary proceeding; the *Memorandum of Law Re: Determination of Domestic Support Obligations for Purposes of Discharge in Bankruptcy* [ECF No. 39] filed by the Plaintiff; *Creditor, Former Wife, Carol A. Hearn's Response to Memorandum of Law Re: Determination of Domestic Support Obligations for Purposes of Discharge in Bankruptcy* [ECF No. 40]; and the post-trial briefs filed by the parties in the form of proposed findings of fact and conclusions of law.

For the reasons stated more fully below, the Court will enter judgment in favor of the Defendant as to Counts I, II, IV, V, VI and VII.  The Court will enter partial judgment in favor of the Plaintiff as to Count III, limited to directing turnover of the assets that the Defendant has already agreed to deliver to the Plaintiff within 30 days after entry of judgment.

**FINDINGS OF FACT**

The Plaintiff and the Defendant were married for approximately ten years.  They did not have any children.  The parties' marriage was dissolved on December 30, 2008 when the Circuit Court of the Nineteenth Judicial Circuit in and for Indian River County Florida (the "Florida Court") entered its Final Judgment of Dissolution of Marriage (the "Florida Judgment").  The Plaintiff was represented by counsel during all aspects of the divorce proceeding.

In October of 2007, the Plaintiff and Defendant participated in a mediation conference in connection with their pending divorce.  The Plaintiff was represented and advised by counsel during the mediation conference.  On October 31, 2007, the Plaintiff and Defendant executed a Mediation Agreement (the "Mediation Agreement").  The Plaintiff's

counsel was present with the Plaintiff when the Plaintiff reviewed and signed the

Mediation Agreement.

Paragraph 10 of the Mediation Agreement states:

Husband [the Plaintiff] shall pay to the Wife [the Defendant] the sum of One Million and no/100 ($1,000,000.00) Dollars as and for non-modifiable lump sum alimony.  This alimony shall not be includable in the Wife's income or deductible by Husband for all federal tax purposes.  Said non-modifiable lump sum alimony shall be for purposes of the Wife's support and shall not be dischargeable in bankruptcy.  Alimony shall be payable as follows:  Two Hundred Fifty Thousand and no/100 ($250,000.00) Dollars within thirty (30) days from the date of the execution of this Mediation Agreement.  The balance of the $750,000.00 shall be paid at the rate of Fifty Thousand ($50,000.00) Dollars principal plus accrued interest payable annually commencing December 1, 2008 and on the 1st day of December each and every year thereafter for ten (10) years until paid in full.  A balloon payment of any remaining principal balance together with any accrued interest shall be payable on any remaining principal balance together with any accrued interest shall be payable on December 1, 2017.  Interest shall accrue on any outstanding balance at the rate of 4% per annum for the first 2 years and 5% per annum thereafter.  Upon the sale of the shopping center owned by West Greeley Associates, LLC in Greeley, Colorado, or the approximately Eight Hundred (800) acres of land preliminarily platted by The Premise, LLC in the City of Castle Rock, County of Douglas, State of Colorado the Husband shall pay the outstanding balance and any accrued interest in full at the time of closing of the first of either said of the properties.

Payment of alimony shall be secured by a third mortgage encumbering the property located at 15 Sailfish Road, Vero Beach, Indian River County, Florida.  Alimony shall also be secured by a lien in favor of the Wife against the Husband's ownership interest in West Greeley Associates, LLC.  The lien shall be prepared and recorded at the Husband's sole expense in a legally acceptable form and in a form approved by counsel for the Wife.  Neither party shall schedule or attend a final hearing until these documents have been approved by Wife's counsel and executed by Husband.

Upon reasonable request by counsel for the Wife, the Husband shall supply any documents necessary to fully describe his interest in the property subject to this agreement.

[Ex. B, p. 5-6, ¶ 10].

Under the Mediation Agreement, the Plaintiff agreed to grant to the Defendant

consensual liens on certain of his assets to secure his obligation to pay to the Defendant an

aggregate of $1,000,000.00 plus interest (the "Lump Sum Alimony").  The collateral was to

include a third mortgage on real property in Vero Beach, Florida and a lien on the Plaintiff's ownership interest in West Greeley Associates, LLC.  In addition, although not included as collateral for the Lump Sum Alimony, the Plaintiff agreed to cause payment of the Lump Sum Alimony from the proceeds of sale of two commercial properties:  (a) a shopping center owned by West Greeley Associates, LLC in Greeley, Colorado, and (b) approximately 800 acres of land owned by The Premise, LLC in Castle Rock, Colorado.  The Plaintiff, directly or indirectly, owned and controlled the entities that held these properties. The Plaintiff testified at trial that he intended to grant the Defendant a lien on his interest in Premise, LLC in connection with the Mediation Agreement, although this is not specifically stated in the Mediation Agreement.

On November 5, 2007, the Florida Court entered an order approving the Mediation Agreement. [Ex. B, p. 2].

The Plaintiff testified that, in spite of the explicit terms of the Mediation Agreement and the repeated use of the term "alimony", he did not intend to provide alimony to the Defendant.  The Plaintiff testified that the mediator drafted the Mediation Agreement and that it was the mediator who used the word "alimony" in the agreement in several places. The Plaintiff testified that he did not have the opportunity to review the legal meaning of the term "alimony" before signing the Mediation Agreement and that he assumed "alimony" was a general term referring to a "cash split."  When asked whether there was any previous indication that the Plaintiff did not intend to provide alimony to the Defendant, the Plaintiff described a premarital agreement with the Defendant that, according to the Plaintiff, stated that in the event of termination of the marriage the Defendant would be entitled only to a division of property and no form of support.  The premarital agreement itself was not admitted into evidence at trial.

The Plaintiff's testimony that he did not intend to agree to payment of alimony to the Defendant was not credible.  Plaintiff was divorced prior to his marriage to the Defendant and likely had an understanding of the concept of alimony before he married the Defendant.  Indeed, the Plaintiff's own testimony regarding his premarital agreement with the Defendant shows that the Plaintiff understood the difference between alimony and property settlement prior to marrying the Defendant.  Plaintiff was represented by counsel in all aspects of his divorce from the Defendant including the negotiation of the Mediation Agreement.  The Mediation Agreement specifically provides that the Lump Sum Alimony "shall not be dischargeable in bankruptcy."  It is hard to imagine that the Plaintiff did not receive legal advice on this obviously negotiated component of the Mediation Agreement.

The Mediation Agreement itself provides additional evidence that the Plaintiff intended to provide alimony to the Defendant.  The Mediation Agreement repeatedly describes the Plaintiff's obligation as "alimony" and "lump sum alimony."  The agreement states that the Lump Sum Alimony is to be "for purposes of the Wife's support."

The fact that the Lump Sum Alimony is described as "non-modifiable" is not dispositive in the context of this case.  The $1 million payment was an immediate obligation of the Plaintiff, intended to provide the Defendant with a nest egg to support her in the coming years.  The Plaintiff was unable to pay the full $1 million Lump Sum Alimony all at once.  Instead, the Lump Sum Alimony was structured as a debt obligation with periodic installments, a balloon payment, and interest.  The Lump Sum Alimony provision in the Mediation Agreement is in effect a promissory note, a present debt obligation from the Plaintiff to the Defendant.  The provision for periodic payment applies only if the Plaintiff has not yet sold designated assets sufficient to pay off the Lump Sum Alimony.  Potential modification of alimony is appropriate where alimony is to be an ongoing obligation and may need to be adjusted to reflect fluctuations in both the financial ability of the payor and

6

the needs of the payee.  Because the intent of the parties here was for the Plaintiff to pay the entire $1 million Lump Sum Alimony as quickly as possible, and this *res* was expected to provide forward looking support to the Defendant, it was not appropriate to provide for future modification.

The tax treatment of the Lump Sum Alimony support's the Plaintiff's argument. Alimony is typically treated as regular income for the recipient and may be claimed as a deduction by the payor.  The Mediation Agreement provides that the Plaintiff will not claim a deduction and the Defendant will not claim the payment as income.  In light of the overwhelming evidence that the Lump Sum Alimony was in fact intended to serve as support for the Defendant, the Court gives little weight to the tax treatment.

The Mediation Agreement states that the lump sum alimony "shall not be dischargeable in bankruptcy."  Alimony, a domestic support obligation under sections 101(14A) and 523(a)(5), is not dischargeable under <u>any</u> chapter of the Bankruptcy Code.  A property settlement obligation under section 523(a)(15) is dischargeable in chapter 13 under section 1328(a)(2).  Given the Plaintiff's financial obligations it is extremely unlikely that the Plaintiff could have been a chapter 13 debtor at the time the Mediation Agreement was executed. *See* 11 U.S.C. § 109(e).  The parties' agreement that the Lump Sum Alimony would be non-dischargeable for all purposes in bankruptcy supports the conclusion that it was intended to be in the nature of alimony rather than a property settlement.

The financial positions of the parties at the time they entered into the Mediation Agreement also supports the conclusion that the Lump Sum Alimony was intended to be a domestic support obligation.[4]  The Defendant had no income since 2003 when she quit her

---

[4] Each party introduced testimony regarding the Defendant's need for support at the time of their divorce, which followed execution of the Mediation Agreement by a number of months.  However, in determining whether an obligation was intended to be in the nature of support, the Court considers

long-held career as a real estate broker to move to Florida with the Plaintiff. The Defendant testified credibly that the award of Lump Sum Alimony was a "very important" component of the Mediation Agreement. In light of her lack of income this is not surprising. From the terms of the Mediation Agreement and the other evidence admitted in this case, it appears that the Plaintiff had significant business operations and investments at the time he signed the Mediation Agreement. Thus, the Defendant had an obvious need for support and the Plaintiff had the ability to provide it. The Lump Sum Alimony provision of the Mediation Agreement was the sole provision of support to the Defendant who was unemployed at the time. The fact that the agreement provided no other form of support for the Defendant supports the conclusion that the payment was intended as alimony.

The fact that the Plaintiff's obligation to pay the Lump Sum Alimony under the Mediation Agreement does not terminate upon death or remarriage of the Defendant is not relevant in this case. The Plaintiff's obligation to pay $1 million to the Defendant was intended to be completed as quickly as possible. If certain assets were sold, the Defendant was to be paid in full. In the meantime the Lump Sum Alimony accrued interest like a debt obligation. The Lump Sum Alimony was not intended to be an ongoing replacement for periodic income. It was a present debt obligation of the Plaintiff in its full amount when agreed[5] and thus would properly have been included in the Defendant's assets if she remarried or in her estate if she was deceased.

---

the relative financial condition of the parties at the time they agreed to the payment. In this case, the relevant time is the execution of the Mediation Agreement.

[5] Although the Florida Court subsequently approved the Mediation Agreement and incorporated it into the Florida Judgment, the $1 million debt stated in the Mediation Agreement arose when the parties executed the Mediation Agreement. *See In re Smith*, 263 B.R. 910, 918-19 (Bankr. M.D. Fla. 2001). Nothing in the Mediation Agreement makes it contingent on court approval or entry of a final judgment dissolving the marriage.

Based on the foregoing, the Court concludes that the Plaintiff and the Defendant intended the Lump Sum Alimony to be in the nature of alimony for the benefit of the Defendant.

Subsequent to the execution of the Mediation Agreement, but prior to the entry of the Florida Judgment, the Plaintiff made two payments to the Defendant under paragraph 10 of the Mediation Agreement in the amounts of $250,000.00 and $150,000.00. The Plaintiff suggested that another payment to the Defendant of approximately $177,000.00 was also partial payment of the Lump Sum Alimony. The evidence does not support this position. It appears that this additional payment consisted of the Defendant's share of proceeds from the sale of real property and that it is unrelated to the Lump Sum Alimony. The Court finds that the Plaintiff made total payments of $400,000 to the Defendant in partial satisfaction of the Lump Sum Alimony.

On December 30, 2008, the Florida Court entered the Florida Judgment. The Florida Judgment incorporated the Mediation Agreement and stated that the "parties are ordered to obey all of its provisions . . . ." [Ex. A, ¶ 5]. However, because the Florida Court had previously ruled that the Plaintiff was unable to secure payment of the Lump Sum Alimony by pledging an interest in West Greeley Associates, and after finding that the Inman Family Trust held the Plaintiff's share of West Greeley Associates and that the Plaintiff had sole dominion and control over the Inman Family Trust, the Florida Court ordered the Defendant to submit lien documents as to the Inman Family Trust. The Florida Court ordered that, upon approval of such documents by that court, the Plaintiff shall execute such documents pursuant to the Mediation Agreement. [Ex. A, ¶ 7]. The Florida Court also ordered the Defendant to return to the Plaintiff "the original 'Note dated September 17, 2007 payable to her by Daniel Thomas Inman in the principal amount of One Hundred Twenty Five Thousand Dollars ($125,000.00)' [the "Note"] as well as the

9

[Plaintiff's] cat's-eye chrysoberyl ring and black onyx diamond ring [together, the "Rings"]."

[Ex. A, ¶ 8].  The Florida Judgment was not at any time stayed by the Florida Court or any

state appeals court.

Although the Defendant provided to the Florida Court and the Plaintiff draft lien

documents for the Vero Beach property as well as for the Inman Family Trust, apparently

prepared by the Plaintiff's own Colorado counsel, the Plaintiff objected to the draft

documents.  No lien documents were ever approved by the Florida Court.  No lien

documents were ever executed by the Plaintiff pursuant to the Mediation Agreement and

the Florida Judgment.

In January 2009 the Defendant sought a hearing in the Florida Court to obtain a

contempt order as a result of the Plaintiff's failure to move forward with the lien documents

as required by the Mediation Agreement and the Florida Judgment.  Prior to that hearing

the Plaintiff appealed the Florida Judgment.  From the evidence presented here, it appears

that the Plaintiff purposely stretched out the negotiation of the lien documents in order to

stymie the Defendant in her efforts to obtain the agreed for collateral to secure payment of

the Lump Sum Alimony.

The Note and the Rings were never delivered to the Plaintiff.  According to the

Defendant, the Rings have been in her safety deposit box in Denver since she moved to

Colorado following the divorce.  The Note, although also in the Defendant's possession, does

not have any value.

After the Plaintiff appealed the Florida Judgment, but prior to the ruling thereon,

the Defendant domesticated the Florida Judgment in Colorado pursuant to Colorado's

Uniform Enforcement of Foreign Judgments Act, Colo. Rev. Stat. §§ 13-53-101, *et seq*.  The

Defendant then initiated proceedings (the "Colorado Proceedings") in the District Court in

Arapahoe County, Colorado (the "Colorado Court") to obtain orders charging the interests of

the Plaintiff in West Greeley Associates, LLC and Premise Real Estate, LLC[6] pursuant to Colo. Rev. Stat. § 7-80-703, and to obtain an order charging the interest of the Plaintiff in Inman Family Enterprises, LLLP pursuant to Colo. Rev. Stat. § 7-60-128.[7]  The Defendant testified credibly that the Plaintiff was in default of his obligations under the Mediation Agreement and that she took these actions in order to protect her interests consistent with the terms of the Mediation Agreement and the Florida Judgment.

The Plaintiff received notice of the Colorado Proceedings.  The Plaintiff testified that he wrote a letter to the judge overseeing the Colorado Proceedings in which the Plaintiff explained that the Florida Judgment had been appealed, but that no appellate ruling had yet issued, and until an appellate ruling had been rendered he did not believe it would be "fair or legal for [the Defendant] to represent that she had a final judgment . . . ."  The Plaintiff testified that he was unable to post the necessary security to stay the Colorado Proceedings.

The Colorado Court entered three orders: (a) Order Charging Interest of Defendant Robert M. Inman in West Greeley Associates, LLC Pursuant to C.R.S. § 7-80-703 [Ex. C]; (b) Order Charging Interest of Defendant Robert M. Inman in Inman Family Enterprises,

---

[6] It appears that the entities referred to in the Mediation Agreement as "The Premise, LLC", at trial as "Premise, LLC", and in the Colorado charging liens (described below) as "Premise Real Estate, LLC", are one and the same.  Likewise, it appears that the entities referred to in the Florida Judgment as the "Inman Family Trust" and in the Colorado charging lien as "Inman Family Enterprises, LLLP" are one and the same.

[7] Colo. Rev. Stat. §§ 7-80-703 and 7-60-128 are substantively identical, except that Colo. Rev. Stat. § 7-80-703 applies to limited liability companies, while Colo. Rev. Stat. § 7-60-128 applies to partnerships, including limited liability limited partnerships.  Colo. Rev. Stat. § 7-80-703 states, in relevant part:

> On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the membership interest of the member with payment of the unsatisfied amount of the judgment with interest thereon and may then or later appoint a receiver of the member's share of the profits and of any other money due or to become due to the member in respect of the limited liability company and make all other orders, directions, accounts, and inquiries that the debtor member might have made, or that the circumstances of the case may require . . . .

LLLP, Pursuant to C.R.S. § 7-60-128 [Ex. D]; and (c) Order Charging Interest of Defendant

Robert M. Inman in Premise Real Estate, LLC Pursuant to C.R.S. § 7-80-703 [Ex. E]

(collectively, the "Charging Liens").  Except for the name of the subject entity and the

statutory reference, the Order Charging Interest of Defendant Robert M. Inman in West

Greeley Associates, LLC Pursuant to C.R.S. § 7-80-703 is representative of the other

Charging Liens.  It states:

> THIS MATTER having come before the Court on the Motion for Entry of
> Charging Order Against Membership Interest of Defendant Robert M. Inman
> in West Greeley Associates, LLC, pursuant to C.R.S. § 7-80-703 filed by Carol
> H. Inman, aka Carol Ann Hearn ("Carol Hearn" or "Plaintiff"),
>
> THE COURT FINDS:
>
> 1.      That the Plaintiff is the holder of a judgment against Defendant
> Robert M. Inman entered on December 29, 2008, in the original amount of
> One Million and no/100 ($1,000,000.00) Dollars (the "Judgment").
>
> 2.      That the following amounts remain unpaid on the judgment:
>
> > a.  Principal:  $627,587.80
> >
> > b.  Interest:  $19,876.48
>
> 3.      That Plaintiff is entitled to charge the interest of the judgment debtor,
> Defendant Robert Inman, in the LLC known as West Greeley Associates,
> LLC ("West Greeley") pursuant to C.R.S. § 7-80-703.
>
> ACCORDINGLY, IT IS HEREBY ORDERED AS FOLLOWS:
>
> > A.      That a charging order is hereby entered in favor of Carol Hearn
> against the membership interest owned by Robert Inman in West Greeley;
>
> > B.      That Carol Hearn shall serve a certified copy of this Order
> upon West Greeley, such service to be accomplished pursuant to C.R.C.P. 4;
>
> > C.      West Greeley shall turn over to the Registry of this Court all
> future distributions, dividends, net profits, or income that Robert Inman
> would be entitled to as a member of West Greeley until the Judgment is
> satisfied;
>
> > D.      That Carol Hearn shall be allowed to obtain all such funds
> deposited into the interest-bearing Registry of the Court, for application to
> the Judgment;

E.      That West Greeley allow representatives of Carol Hearn to inspect the books and records of West Greeley, upon reasonable notice, of not less than seven (7) days;

F.      That the Clerk of the Court set-up an interest bearing account for purposes of implementation of this order, and

G.      That a copy of this Order may be filed in any civil action in which West Greeley is a party.

The Charging Liens were not appealed or otherwise challenged in Colorado.  No evidence was presented in the instant proceeding regarding the value of the entities covered by the Charging Liens or of the Plaintiff's interests therein.

On February 10, 2010, after the Charging Liens had been entered, the Florida Fourth District Court of Appeal issued the following ruling on the appeal of the Florida Judgment:

> In a final judgment of dissolution of marriage, the trial judge essentially reserved jurisdiction to determine which item of the husband's property would be subject to a lien to secure the wife's alimony payments. The trial judge reasonably took this action as a result of the husband's mistaken belief that a certain asset could be encumbered. As a result, a term in the parties' mediation agreement could not be completely fulfilled. Although the final judgment had the effect of terminating the marriage and finally adjudicating certain issues, procedurally it did not bring an end to the judicial labor required in this case. Therefore, the order is not appealable as a final order. *See Demont v. Demont*, 24 So.3d 699 (Fla. 1st DCA 2009). We dismiss the appeal without prejudice to either party's right to file a timely notice of appeal after a final order has been rendered by the trial court.

*Inman v. Inman*, 26 So. 3d 724 (Fla. 4th DCA 2010).

The Plaintiff alleges that the Defendant falsely represented the status of the Florida Judgment to the Colorado Court in order to obtain the Charging Liens.  There is no evidence to support this allegation.  The Florida Judgment was a final order on its face and specifically directed that the parties were to obey all provisions of the Mediation Agreement.  At the time the Defendant pursued the Colorado Proceedings, the Florida Judgment was subject to appeal (and the Colorado Court was advised of the appeal) but no

stay had issued.   There was no reason for the Defendant to believe that the Florida Judgment was not a final order in all respects.

The Plaintiff alleges that in pursuing the Charging Liens the Defendant engaged in overreaching, fraudulent and inequitable conduct.  There is no evidence to support these allegations.  After the Plaintiff defaulted on his obligations under the Mediation Agreement by purposely delaying execution of documents intended to provide collateral security for the Lump Sum Alimony, the Defendant took reasonable action to ensure collection of amounts due to her.  She went to Colorado and obtained liens on the Plaintiff's interests in the entities holding substantially the same assets as she was promised under the Mediation Agreement.  Even if these assets were not exactly what the Plaintiff agreed to provide to her in the Mediation Agreement, the Defendant properly pursued payment under the Florida Judgment by executing on that judgment in a manner allowed by law.

On March 26, 2010, the Plaintiff filed a petition for relief in this Court under chapter 11 of United States Bankruptcy Code.  The Plaintiff did not list in his schedules of assets either the Rings or the Note.

On July 12, 2010, the Defendant filed Proof of Claim No. 12-1 in the amount of $667,920.77 (the "Defendant's Claim"), to which the Defendant attached copies of the Florida Judgment, the Mediation Agreement, the Charging Liens and other documents. The Defendant indicated on the claim form that the claim is secured by the Charging Liens and that the claim is entitled to priority as a domestic support obligation.  To demonstrate how her claim was calculated, the Defendant attached a table indicating the principal payments received from the Plaintiff and the pre-petition interest that accrued on the claim under the terms of the Mediation Agreement. [Ex. B, p. 28].  There is no evidence that the Defendant's Claim contains fraudulent allegations or was filed in bad faith as the Plaintiff alleges.

**CONCLUSIONS OF LAW**

**Count I - Avoidance of Liens**

The Defendant holds charging liens on the Plaintiff's interests in West Greeley

Associates, LLC, Inman Family Enterprises, LLLP, and Premise Real Estate, LLC. The

Plaintiff offered no evidence as to the value of these entities or the Plaintiff's interests

therein. Therefore, the Court will deny relief as to the component of Count I requesting

that the Court avoid the unsecured portions of the Charging Liens. There was no evidence

presented in support of the Plaintiff's allegations that the Defendant made false

representations to the Colorado Court in connection with obtaining the Charging Liens.

Thus, the Court will limit its discussion of Count I to the Plaintiff's allegation that the

Charging Liens are void or voidable based on the argument that the Florida Judgment was

not a final judgment at the time the Charging Liens were granted.

The Plaintiff argues that the Florida Judgment was not entitled to full faith and

credit in Colorado because it was not a final judgment. Therefore, the Plaintiff argues, the

Court should avoid the Charging Liens stemming from the Florida Judgment.

Colorado's Uniform Enforcement of Foreign Judgment's Act provides as follows:

> A copy of any foreign judgment authenticated in accordance with the act of
> congress or the laws of this state may be filed in the office of the clerk of any
> court of this state which would have had jurisdiction over the original action
> had it been commenced first in this state. A judgment so filed has the same
> effect and is subject to the same procedures, defenses, and proceedings for
> reopening, vacating, or staying as a judgment of the court of this state in
> which filed and may be enforced or satisfied in like manner.

Colo. Rev. Stat. § 13-53-103.

"'Foreign judgment' means any judgment, decree, or order of a court of the United

States or any other court . . . that is entitled to full faith and credit in this state." Colo. Rev.

Stat. § 13-53-102. For a judgment, decree, or order to be entitled to full faith and credit in

Colorado, it must be final. *Marworth, Inc. v. McGuire*, 810 P.2d 653, 655 (Colo. 1991)

15

(citing to *Underwriters Nat'l Assurance Co. v. North Carolina Life and Accident and Heath Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982). "Whether action by a court possesses the necessary finality to be a final judgment is determined by the local law of the state of rendition." *Rash v. Rash*, 173 F.3d 1376, 1380 (11th Cir. 1999) (citing Restatement (Second) of Conflicts of Laws § 107 (1971)). Therefore, this Court looks to Florida law to determine whether the Florida Judgment was a final judgment at the time the Defendant obtained the Charging Liens.

"A judgment may be final under the local law of the state of rendition as to some matters and yet not final as to other matters. To the extent that a judgment is final in the state of rendition, it will be treated as such in other states." Restatement (Second) of Conflicts of Laws § 107 cmt. d (1971). For enforcement purposes, a Florida judgment is final if it "'determines the rights of the parties and disposes of the cause on its merits leaving nothing more to be done other than to enforce the judgment.'" *Ewers v. Walsh (In re Walsh)*, 123 B.R. 925, 928 (quoting *Donaldson Eng'g, Inc. v. City of Plantation*, 326 So. 2d. 209, 210 (Fla. 4th DCA 1976)). The fact that a judgment bears the title 'Final Judgment' is not dispositive. *Ewers*, 123 B.R. at 928. Nor is it dispositive that a judgment lacks the traditional language 'for which let execution issue'. *Friedman v. Friedman*, 825 So. 2d 1010, 1011 (Fla. 4th DCA 2002).

The Florida Judgment was and remains a final judgment for purposes of the Colorado Proceedings. According to the ruling of Florida Fourth District Court of Appeal in this matter, the Florida Judgment "had the effect of terminating the marriage and finally adjudicating certain issues" and the only issue not finally determined by the Florida Judgment was "which item of the husband's property would be subject to a lien to secure the wife's alimony payments." *Inman*, 26 So. 3d 724. Although not final for purposes of

appeal because the Florida Court had yet to approve the lien documents, the other provisions of the Florida Judgment, including the requirement that the Plaintiff pay the Lump Sum Alimony, were subject to enforcement at the time the Defendant pursued the Colorado Proceedings.  The Florida Judgment was correctly afforded full faith and credit in Colorado.  The Charging Liens are not subject to avoidance as a result of any infirmity in the finality of the Florida Judgment.  The Plaintiff is not entitled to relief on Count I.

Even if the Florida Judgment was not a final order entitled to full faith and credit in Colorado, the Charging Liens entered by the Colorado Court are themselves entitled to full faith and credit in this Court.  The doctrines of *res judicata*, collateral estoppel and *Rooker-Feldman* prohibit this Court from reconsidering the validity of the Charging Liens.

"[T]he Full Faith and Credit Act, 28 U.S.C. § 1738, compels a federal court to accord a state court judgment the same preclusive effect that it would be accorded by the rendering state court." *In re Zoernack*, 289 B.R. 220, 226 (Bankr. M.D. Fla. 2003).  In order to effectuate the Full Faith and Credit Act, "federal courts consistently have applied res judicata and collateral estoppel to causes of action and issues decided by state courts." *Kremer v. Chemical Constr. Corp*, 456 U.S. 461, 467 n.6 (1982).  While the *Rooker-Feldman* doctrine is closely related to res judicata and collateral estoppel, the purpose of the *Rooker-Feldman* doctrine is to limit the jurisdiction of most federal courts over state court litigation. *See In re Zoernack*, 289 B.R. at 230.  The three doctrines may apply when a debtor asks a bankruptcy court to second guess an alleged "wrongfully entered" state court order imposing a charging lien. *Id.*

The doctrine of *res judicata* precludes the Plaintiff from asserting a claim challenging the validity of the Charging Liens.  Res judicata, or claim preclusion, "bars the

parties to an action from relitigating matters which were or could have been litigated in an earlier suit." *Shurick v. Boeing Co.*, 623 F. 3d 1114, 1116 (11th Cir. 2010).  When a federal court considers applying *res judicata* to a state court judgment, the *res judicata* principles of that state apply. *Kizzire v. Baptist Health System, Inc.*, 441 F. 3d 1306, 1308 (11th Cir. 2006).  Under Colorado law, "[f]or a claim in a second judicial proceeding to be precluded by a previous judgment, there must exist: (1) finality of the first judgment, (2) identity of subject matter, (3) identity of claims for relief, and (4) identity or privity between parties to the actions." *Argus Real Estate, Inc. v. E-470 Pub. Highway Auth.*, 109 P.3d 604, 608 (Colo. 2005).

The Charging Liens each satisfy the finality element.  In Colorado, "[a] final judgment is defined as one which ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceeding." *Stillings v. Davis*, 406 P.2d 337, 338 (Colo. 1965).  Such a final judgment must be entered on the merits of the case by a court of competent jurisdiction. *Batterman v. Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1118 (Colo. App. 1990).  The Colorado Court is a court of competent jurisdiction.  It is clear from the face of the Charging Liens, which were not stayed, appealed or otherwise challenged, that they ended the action and left nothing for the Colorado Court to determine with regard to the rights of the Plaintiff and the Defendant.  Each Charging Lien contains findings showing that it was entered on the merits of the case.

The subject matter of the Colorado Proceedings and Count I of the Complaint are identical.  In Colorado, subject matter refers to the material facts, events, transactions, or objects upon which a claim is based. *See Fortner v. ATF Agents Dog 1, Cat 2, Horse 3*, 2010 WL 378530, at *9 (D. Colo. Jan. 25, 2010); *see also Squire v. United Airlines, Inc.*, 973 F.

Supp. 1004, 1006 (D. Colo. 1997). The Florida Judgment is the subject of both Count I in this adversary proceeding and the Colorado Proceedings.

The claims presented in the Colorado Proceedings and in Count I of the Complaint are identical. In applying the identity of claims element, the Court must ask whether the injury for which relief is requested is the same in the first and second proceeding. *Argus*, 109 P.3d at 608-09. *Res judicata* applies to claims in the second proceeding that were, or could have been, defenses in the first. *See Lobato v. Taylor*, 70 P.3d 1152, 1167 (Colo. 2003). Therefore, the question here becomes: Is the injury for which relief is sought in the current proceeding identical to an actual or potentially raised defense in the Colorado Proceedings?

To answer that question, the Court must determine what would have constituted a valid defense in the Colorado Proceedings. Unless a separate Colorado civil action to establish the judgment is initiated, a foreign judgment entitled to full faith and credit must be properly domesticated via the Colorado Uniform Enforcement of Judgments Act in order to be enforced through the judicial processes of Colorado. *Griggs v. Gibson*, 754 P.2d 783, 785 (Colo. App. 1988). Thus, in order to rule that the Defendant could utilize Colo. Rev. Stat. §§ 7-80-703 and 7-60-128 to enforce the Florida Judgment, the Colorado Court needed first to find that the elements necessary for domesticating a foreign judgment had been satisfied. As discussed above, due to the interplay of Colo. Rev. Stat. §§ 13-53-102 and 13-53-103, a determination by the Colorado Court that the Florida Judgment was final and entitled to full faith and credit was required in order to enter the Charging Liens. Therefore, a potential defense held by the Plaintiff in the Colorado Proceedings was that the Florida Judgment was not final and thus not entitled to full faith and credit. The fact that the Plaintiff did not actually present this defense (aside from the letter he sent to the Colorado Court) due to his inability to post the necessary security does not matter. The Plaintiff could have raised this defense. This potential defense is now a claim in the

19

current proceeding.  The Plaintiff argues here that the Florida Judgment was not entitled to full faith and credit in Colorado.  This claim is the mirror image of the Plaintiff's potential defense in the Colorado Court.  Accordingly, the identity of claims element is satisfied.[8]

The final element of *res judicata* is satisfied because the parties in the Colorado Proceedings and this adversary proceeding are identical.  Therefore, the doctrine of *res judicata* precludes the Plaintiff from seeking avoidance of the Charging Liens based on the argument that the Florida Judgment was not final and should not have been accorded full faith and credit in the Colorado Proceedings.

Likewise, the Plaintiff is collaterally estopped from re-litigating the issue of whether the Florida Judgment was a final judgment entitled to full faith and credit in the Colorado Proceedings.  Collateral estoppel, or issue preclusion, "prohibits the relitigation of issues that have been adjudicated in a prior action." *Bush v. Balfour Beatty Bahamas, Ltd.* (*In re Bush*), 62 F.3d 1319, 1322 (11th Cir. 1995).  "The basic difference between res judicata . . . and collateral estoppel . . . is that [res judicata] applies to whole claims, whether litigated or not, whereas [collateral estoppel] applies to particular issues that have been contested or resolved." *Zoernack*, 289 B.R. at 228.  "If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect." *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 675-76 (11th Cir. 1993).  In Colorado, collateral estoppel applies when:

> (1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) The party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) There was a final judgment on the merits in the prior proceeding; (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding.

---

[8] The Court notes that the Florida Judgment was in fact final at the time of the Colorado Proceedings and thus the defense, if presented, would have failed.

*Bebo Constr. Co. v. Maddox & O'Brien, P.C.*, 990 P.2d 78, 84-85 (Colo. 1999) (internal

citation omitted).

The issues of the finality of the Florida Judgment and its entitlement to full faith

and credit were actually litigated by the parties in the Colorado proceedings.  In Colorado,

an issue is actually litigated when it was raised by the parties in the prior action through

an "appropriate pleading . . . submitted for determination and then actually determined by

the adjudicatory body." *Bebo*, 990 P.2d at 85.  In requesting the Charging Liens, the

Defendant plead to the Colorado Court that the Florida Judgment was a final order entitled

to full faith and credit.  Colorado law required that the Colorado Court find that the Florida

Judgment was a final judgment entitled to full faith and credit in Colorado.  In each of the

Charging Liens, the Colorado Court found "[t]hat the [Defendant] is the holder of a

judgment against [the Plaintiff] entered . . . in the original amount of One Million and

no/100 ($1,000,000.00) Dollars (the 'Judgment')". [Ex's. C, D, E].  By so finding, the

Colorado Court adjudicated the issues of the finality of the Florida Judgment and its

entitlement to full faith and credit.  These issues were actually litigated.

The issues of the finality of the Florida Judgment and its entitlement to full faith

and credit were necessarily adjudicated by the Colorado Court.  "An issue is necessarily

adjudicated when a determination on that issue was necessary to a judgment." *Bebo*, 990

P.2d at 86.  As discussed above , in order to rule that the Florida Judgment could be

enforced via Colo. Rev. Stat. § 7-80-703, it was necessary for the Colorado Court to find that

the Florida Judgment was final and entitled to full faith and credit, which the Colorado

Court did when it entered the Charging Liens.

As stated in the discussion of *res judicata*, the Charging Liens are final orders on the merits and the parties in the Colorado Proceedings and this adversary proceeding are identical.  Therefore, the second and third elements of collateral estoppel are satisfied.

As to the fourth element of collateral estoppel, the Plaintiff had a full and fair opportunity to litigate the issues of whether the Florida Judgment was final and entitled to full faith and credit.

> [F]actors determinative of whether an individual received a full and fair opportunity to litigate include: whether the remedies and procedures of the first proceeding are substantially different from the proceeding in which collateral estoppel is asserted; whether the party in privity with the party against whom collateral estoppel is sought had sufficient incentive to litigate vigorously; and the extent to which the issues are identical.

*Bebo*, 990 P.2d at 87.  "An inquiry into whether a party received a full and fair opportunity to litigate an issue must look to whether the initial proceeding was so inadequate or so narrow in focus as to deprive an individual of his or her due process rights should application of the doctrine of collateral estoppel be used to bar relitigation of that issue." *Id*.  While the procedures utilized in the Colorado Proceedings differ in non-material ways from those used in this Court, the remedies in the two proceedings are identical – the disposition of charging liens.  The Plaintiff had adequate notice of the Colorado Proceedings and sufficient incentive to litigate vigorously in Colorado.  Finally, the issues – whether the Florida Judgment was final and entitled to full faith and credit – are identical.  The Plaintiff had a full and fair opportunity to litigate the issues to which collateral estoppel is being applied.  Therefore, the Plaintiff is collaterally estopped from re-litigating whether the Florida Judgment was a final judgment entitled to full faith and credit in Colorado.

In addition, the *Rooker-Feldman* doctrine bars this Court from entering an order avoiding the Charging Liens.  Simply put, the *Rooker-Feldman*[9] doctrine prevents federal courts other than the United States Supreme Court from reviewing the final judgments of state courts. *In re Zoernack*, 289 B.R. at 230.  As discussed above, the Charging Liens have the effect of final judgments.  Therefore, the doctrine applies to bar this Court from acting "as an appellate court . . . re-review[ing] the validity of the Charging Lien[s]." *Id.*

In sum, the Charging Liens are entitled to full faith and credit and the doctrines of *res judicata*, collateral estoppel and *Rooker-Feldman* bar the component of Count I of the Complaint in which the Plaintiff seeks to avoid the Charging Liens on the ground that the Florida Judgment was not final when the Charging Liens were obtained.  The Plaintiff is not entitled to relief on Count I.

### Count II - Avoidance of Liens

The Defendant holds charging liens on the Plaintiff's interests in West Greeley Associates, LLC, Inman Family Enterprises, LLLP, and Premise Real Estate, LLC.  As noted above, the Plaintiff offered no evidence as to the value of these entities or the Plaintiff's interests therein.  Therefore, the Court will deny relief as to the component of Count II requesting that the Court avoid the unsecured portions of the Charging Liens. The Court limits its analysis of Count II to the component of Count II in which the Plaintiff seeks to avoid the Charging Liens on the ground that the Charging Liens exceed the liens to be granted to the Defendant under the Mediation Agreement and the Florida Judgment.

The Plaintiff argues that the Charging Liens cover assets other than and in addition to those to be granted under the Mediation Agreement and the Florida Judgment.  The Plaintiff argues that the Defendant should be limited to what was agreed in the Mediation

---

[9] The doctrine derives its name from two United States Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

Agreement, that no liens were ever granted as a result of the Mediation Agreement, and that the Charging Liens should thus be avoided.

In the Mediation Agreement, which is incorporated into the Florida Judgment, the Plaintiff agreed to grant liens to the Defendant to secure the Plaintiff's obligation to pay the Lump Sum Alimony. The Plaintiff agreed to consensual liens to secure his monetary obligation. However, neither the terms of the Mediation Agreement nor the Florida Judgment limit the Defendant's ability to execute on the judgment by the usual methods, including obtaining liens on the Plaintiff's other assets. The Florida Judgment was final on its face and was and remains subject to execution. The Plaintiff defaulted under the Mediation Agreement and the Florida Judgment by failing to grant the consensual liens addressed in those documents. The Defendant took the Florida Judgment to Colorado to pursue execution on the Plaintiff's assets. There is nothing unusual about this course of conduct. Absent a specific prohibition on the Defendant's ability to execute the Florida Judgment, this Court sees no reason for the limitation pressed by the Plaintiff. The Plaintiff is in no position to argue that his failure to comply with the clear provisions of the Mediation Agreement and the Florida Judgment should not subject him to collection activity.

In addition, for the reasons stated above, the *Rooker-Feldman* doctrine forecloses the relief sought in Count II of the Complaint. Even if the Plaintiff was correct in his argument that the inclusion of specific liens to be granted under the Mediation Agreement, incorporated into the Florida Judgment, thus limited the Defendant to such liens, the Charging Liens are final orders of the Colorado Court. The Plaintiff did not challenge the Charging Liens in the Colorado Court. This Court is bound by the Charging Liens as final orders of a court of competent jurisdiction.

For the foregoing reasons, the Plaintiff is not entitled to relief on Count II.

**Count III - Turnover, Accounting, and Attorney's Fees and Costs**

In Count III of the Complaint, the Plaintiff seeks an order pursuant to section 542(a) directing the Defendant to turn over the Rings and the Note, or monetary damages equal to their value, as well as an accounting.

Section 542(a) requires that persons in possession of property that the debtor-in-possession may use deliver this property to the debtor-in-possession and account for the property unless such property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a) (made applicable to the Plaintiff by 11 U.S.C. § 1107(a)). At trial, the Defendant accounted for the Rings, which remain in her possession, and the Plaintiff conceded that the Note has no value. The Defendant agreed to deliver the Rings and the Note to the Plaintiff within thirty days from the entry of judgment.

Count III also includes a request for an award of attorney's fees and costs, apparently under Fla. Stat. § 57.105 or this Court's equitable powers under section 105(a). The requested relief is not warranted. No provision of Fla. Stat. § 57.105 is applicable here. When the Court lacks a statutory basis to award attorney's fees and costs, it may not rely on its equitable powers to do so. *Matter of Provincetown-Boston Airline, Inc.*, 73 B.R. 43, 44 (Bankr. M.D. Fla. 1987). In denying this relief, the Court notes that the Plaintiff did not schedule the Rings or the Note in this case.

The Plaintiff is entitled to relief on Count III to the extent that the Court will order the Defendant to return the Rings and the Note to the Plaintiff within thirty days of the entry of judgment in this proceeding. The Plaintiff is not entitled to relief on Count III to the extent the Plaintiff seeks an accounting, damages or attorney's fees and costs.

**Count IV - Damages**

The Plaintiff did not proceed with Count IV for damages at trial. Accordingly, the Plaintiff is not entitled to relief on Count IV.

25

**Count V -  Dischargeability under Sections 523(a)(5) and 523(a)(15)**

In Count V of the Complaint, the Plaintiff seeks a determination that the

Defendant's Claim is not a debt of the kind defined under sections 523(a)(5) or 523(a)(15)

and is therefore dischargeable.

A discharge under chapter 11 does not discharge an individual debtor "from any debt

excepted from discharge under section 523."  11 U.S.C. § 1141(d)(2).  Section 523(a)(5)

excepts from discharge any debt "for a domestic support obligation." 11 U.S.C. § 523(a)(5).

A domestic support obligation is defined, in pertinent part, as:

> [A] debt that accrues before, on, or after the date of the order for relief in a
> case under this title, including interest that accrues on that debt as provided
> under applicable nonbankruptcy law notwithstanding any other provision of
> this title, that is . . . owed to or recoverable by a . . . former spouse . . .  of the
> debtor . . . in the nature of alimony, maintenance, or support . . . of such . . .
> former spouse  . . . without regard to whether such debt is expressly so
> designated . . .  established or subject to establishment before, on, or after the
> date of the order for relief in a case under this title, by reason of applicable
> provisions of− (i) a separation  agreement,  divorce decree, or  property
> settlement  agreement; (ii)  an  order  of  a  court  of  record;  or  (iii)  a
> determination made in accordance with applicable nonbankruptcy law by a
> governmental unit . . . and . . . not assigned to a nongovernmental entity,
> unless that obligation is assigned voluntarily by the spouse, former spouse,
> child of the debtor, or such child's parent, legal guardian, or responsible
> relative for the purpose of collecting the debt.

11 U.S.C. § 101(14)(A) (emphasis supplied).

A debt is defined as "liability on a claim." 11 U.S.C. § 101(12).  A claim is a "right to

payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured . . . ." 11 U.S.C. § 101(5).  The Plaintiff owes a debt -- the Lump Sum Alimony --

to the Defendant, his former spouse, pursuant to the Mediation Agreement and the Florida

Judgment.  The Mediation Agreement is a separation agreement.  The Florida Judgment is

an order of a court of record.  Such debt has not been assigned.  Therefore, the only element

of sections 523(a)(5) and 101(14)(A) in question is whether such debt is in the nature of alimony, maintenance or support.[10]

"Whether a given debt is in the nature of support is an issue of federal law." *Cummings v. Cummings*, 244 F.3d 1263, 1265 (11th Cir. 2001). While federal law controls, relevant state law provides guidance on the question. *Cummings*, 244 F.3d at 1265. "A debt is in the nature of support or alimony if at the time of its creation the parties intended the obligation to function as support or alimony . . . [T]he touchstone for dischargeability under § 523(a)(5) is the intent of the parties." *Id.* at 1265-66. "[A]ll evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent is relevant." *Id.* at 1266 (internal citation omitted).

The Eleventh Circuit recently provided guidance on factors that may be considered in determining the parties' subjective intent, directing the court to consider:

> (1) the agreement's language; (2) the parties' financial positions when the agreement was made; (3) the amount of the division; (4) whether the obligation ends upon death or remarriage of the beneficiary; (5) the frequency and number of payments; (6) whether the agreement waives other support rights; (7) whether the obligation can be modified or enforced in state court; and finally (8) how the obligation is treated for tax purposes.

*Benson v. Benson (In re Benson)*, 441 F. App'x 650, 651 (11th Cir. 2011) (citing *McCollum v. McCollum (In re McCollum)*, 415 B.R. 625, 631 (Bankr. M.D. Ga. 2009)). No single factor is

---

[10] At trial, the Plaintiff argued that the Lump Sum Alimony is not owed to or recoverable by the Defendant because the Florida Judgment is not final and the Mediation Agreement is not enforceable by the Defendant because the Defendant has not performed under the Mediation Agreement. This argument is without merit. The Florida Judgment is final with regard to the Plaintiff's monetary obligations. Even assuming that the Florida Judgment is not final, the Lump Sum Alimony would still be recoverable by the Defendant. Nothing in the Mediation Agreement makes the Plaintiff's obligation to pay the Lump Sum Alimony contingent upon the Defendant's performance. Any failure by the Defendant to perform under the Mediation Agreement is non-material in light of the Plaintiff's default. In any case, the Plaintiff's own actions in paying to the Defendant $400,000 of the Lump Sum Alimony belie his contention that the debt is not owed to or recoverable by the Defendant.

controlling or more important than any other. *Pylant v. Plyant (In re Plyant)*, 467 B.R. 246, 252 (Bankr. M.D. Ga. 2012).

Here, the Plaintiff's prior experience in divorce, and the fact that he was represented by counsel throughout negotiation and documentation of the Mediation Agreement, lead the Court to give particular weight to the language in the Mediation Agreement itself. The Eleventh Circuit cautioned that "a court cannot rely solely on the label used by the parties . . . it is likely that neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose." *Cummings*, F.3d at 1265 (internal citation omitted). Yet, in this case the Plaintiff and Defendant did in fact contemplate the effect of the Plaintiff's subsequent bankruptcy and the parties agreed that the Lump Sum Alimony would be excepted from discharge in all cases. The intent of the Plaintiff and the Defendant is clear from the plain language of the Mediation Agreement. The Court's detailed findings, above, addressing the factors outlined in *Benson*, taken as a whole, further support the conclusion that the Plaintiff's obligations to pay Lump Sum Alimony under the Mediation Agreement were intended by the parties to provide support for the Defendant within the meaning of sections 523(a)(5) and 101(14A). The Court concludes that the Defendant's Claim is a domestic support obligation and is excepted from discharge pursuant to section 523(a)(5).

Because the Court has determined that the Plaintiff's obligation to pay the Lump Sum Alimony is in the nature of alimony or support and thus a domestic support obligation excepted from discharge under section 523(a)(5), the alternative argument that the Lump Sum Alimony is excepted from discharge under section 523(a)(15) is moot. Nevertheless, if

the Lump Sum Alimony was not excepted from discharge under section 523(a)(5), it would

still be excepted from discharge under section 523(a)(15).[11]

Section 523(a)(15) excepts from discharge any debt

to a spouse, former spouse, or child of the debtor and not of the kind
described in [section 523(a)(5)] that is incurred by the debtor in the course of
a divorce or separation or in connection with a separation agreement, divorce
decree or other order of a court of record, or a determination made in
accordance with State or territorial law by a governmental unit.

11 U.S.C. § 523(a)(15).

The analysis required under section 523(a)(15) is much simpler than that required

under section 523(a)(5).  "[A] debt will be excepted from discharge under § 523(a)(15) when

these three elements are met: (1) the debt in question is to a spouse, former spouse or child

of the debtor; (2) the debt is not a support obligation of the type described in § 523(a)(5);

and (3) the obligation was incurred during the course or in connection with a separation

agreement, divorce decree or other order of a court of record."  *Reissig v. Gruber (In re*

*Gruber)*, 436 B.R. 39, 44 (Bankr. N.D. Ohio 2010).  The Plaintiff's obligation to pay Lump

Sum Alimony is owed to a former spouse and was incurred under the Mediation Agreement,

a separation agreement, and the Florida Judgment, a divorce decree.   Thus, if the Lump

Sum Alimony was not a domestic support obligation, it would still be excepted from

discharge under section 523(a)(15).

For the foregoing reasons, the Plaintiff is not entitled to relief on Count V.

**Count VI - Equitable Subordination of Claim and Transfer of Liens**

In Count VI of the Complaint, the Plaintiff seeks equitable subordination of the

Defendant's Claim to all general unsecured claims in this case and the transfer of the

---

[11] The distinction between debts covered by sections 523(a)(5) and 523(a)(15) is important in a
chapter 11 case because, while both types of debts are excepted from discharge, domestic support
obligations are priority claims under section 507(a)(1) and must be paid in full on the effective date
of a chapter 11 plan unless the claimant agrees otherwise. 11 U.S.C. § 1129(a)(9)(B).

Charging Liens to the estate, pursuant to section 510(c).  Alternatively, the Plaintiff seeks

an order disallowing the Defendant's Claim in its entirety and avoiding the Charging Liens.

The Plaintiff argues that such relief is warranted because of the Defendant's alleged

overreaching, fraudulent and otherwise inequitable conduct.

> Pursuant to section 510(c), the Court may
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

> Proper exercise of the equitable subordination power can take place only where three elements are established:
>
> (1) The claimant must have engaged in some type of inequitable conduct,
>
> (2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant,
>
> (3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Allied E. States Maint. Corp. v. Miller (In re Lemco Gypsum, Inc.)*, 911 F.2d 1553, 1556

(11th Cir. 1990) (internal citation omitted).

As discussed more fully in the Court's findings of fact, the Defendant did not engage

in any overreaching, fraudulent or otherwise inequitable conduct.  The Plaintiff is not

entitled to relief on Count VI.

### Count VII - Disallowance of the Defendant's Claim

In Count VII of the Complaint, the Plaintiff seeks disallowance of the Defendant's

Claim based on allegations that the claim: (a) contains fraudulent statements; (b) was filed

in bad faith; and (c) is a false and fraudulent proof of claim, the filing of which constitutes bankruptcy fraud.

The filing of a proof of claim is *prima facie* evidence of the claim's validity. Fed. R. Bankr. P. 3001(f).  The Plaintiff presented no credible evidence to support his allegations and therefore did not meet his burden in challenging the Defendant's Claim.  The Plaintiff is not entitled to relief on Count VI.

**CONCLUSION**

For the foregoing reasons, the Court will enter a separate judgment:

1.    In favor of the Defendant as to Count I of the Complaint;

2.    In favor of the Defendant as to Count II of the Complaint;

3.    In favor of the Plaintiff as to Count III of the Complaint to the extent that the Court will order the Defendant to deliver to counsel for the Plaintiff the Rings and the Note not later than 30 days after entry of judgment, and otherwise in favor of the Defendant as to the remainder of Count III;

4.    In favor of the Defendant as to Count IV of the Complaint;

5.    In favor of the Defendant as to Count V of the Complaint;

6.    In favor of the Defendant as to Count VI of the Complaint;

7.    In favor of the Defendant as to Count VII of the Complaint and the Defendant's Claim shall be allowed in the amount of $667,920.77 plus pre and post-petition interest, as a secured claim to the extent of the value of the Charging Liens pursuant to section 506, and as a priority claim under section 507(a)(1)(A) to the extent not so secured.

### 

Copies furnished to:

All counsel of record by the Clerk of Court.